# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

JAMES HOOD,

               Plaintiff,

vs.

DAVID UPAH and BENTON
COUNTY, IOWA,

               Defendants.

No. 11-CV-96-LRR

**ORDER**

---

## TABLE OF CONTENTS

I.      **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.     **PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.    **SUBJECT MATTER JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . **3**

IV.    **SUMMARY JUDGMENT STANDARD** . . . . . . . . . . . . . . . . . . . . . . . **3**

V.     **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . **4**
       **A.**    *Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
       **B.**    *Facts Underlying Complaint* . . . . . . . . . . . . . . . . . . . . . . . . . **4**
       **C.**    *Guilty Plea* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
       **D.**    *Facts Underlying Proposed Amended Complaint* . . . . . . . . . . . . . **9**

VI.    **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
       **A.**    *Motion for Summary Judgment* . . . . . . . . . . . . . . . . . . . . . . . **10**
           *1.*    **Heck** *doctrine* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
                *a.*    *The relationship between the offense*
                     *and the alleged force* . . . . . . . . . . . . . . . . . . . . . **11**
                *b.*    *Whether Plaintiff's Complaint contradicts the facts*
                     *underlying his conviction* . . . . . . . . . . . . . . . . . . . **14**
           *2.*    *Issue preclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
           *3.*    *Qualified immunity* . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**
           *4.*    *Municipal liability* . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**
       **B.**    *Motion to Amend* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

VII.   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

## I.  INTRODUCTION

The matters before the court are Defendants Deputy David Upah and Benton County, Iowa's "Motion for Summary Judgment" (docket no. 7) and Plaintiff James Hood's "Motion for Leave to File First Amended and Substituted Complaint and Jury Demand" ("Motion to Amend") (docket no. 18) (collectively, "Motions").

## II.  PROCEDURAL BACKGROUND

On September 1, 2011, Plaintiff filed a one-count Complaint (docket no. 2) against Defendants alleging that, on or about September 12, 2009, Deputy Upah used excessive force when he arrested Plaintiff, in violation of the Constitutions of the United States and the State of Iowa.  The Complaint alleges that Benton County is liable for Deputy Upah's actions because his conduct was in accord with Benton County's policies and practices, Benton County failed to properly train and supervise Deputy Upah and Benton County had knowledge of Deputy Upah's tendency to use excessive force in effectuating arrests.  On September 22, 2011, Defendants filed an Answer (docket no. 4) denying liability and asserting affirmative defenses.

On November 30, 2011, Defendants filed the Motion for Summary Judgment, seeking to dismiss Plaintiff's excessive force claim.  On January 27, 2012, Plaintiff filed a Resistance (docket no. 14) to the Motion for Summary Judgment.  On February 9, 2012, Defendants filed a Reply (docket no. 17).  On March 6, 2012, Plaintiff filed the Motion to Amend, seeking permission to file the First Amended and Substituted Complaint ("Proposed Amended Complaint") (docket no. 18-1).  The Proposed Amended Complaint adds two additional counts, alleging that Defendants violated Plaintiff's right to free speech and retaliated against him.  On March 12, 2012, Defendants filed a Resistance (docket no. 19) to the Motion to Amend.  Plaintiff did not file a reply and the time for doing so has expired.  *See* LR 7(g).  On June 28, 2012, the court held a hearing ("Hearing") on the Motion for Summary Judgment.  The Motions are fully submitted and ready for decision.

### III.  SUBJECT MATTER JURISDICTION

The court has federal question subject matter jurisdiction over the Complaint because Plaintiff's excessive force claim arises under the United States Constitution and is brought pursuant to 42 U.S.C. § 1983.  *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  To the extent Plaintiff's excessive force claim arises under the Iowa Constitution,[1] the court has supplemental jurisdiction over such claim because "the federal-law claim[] and state-law claim[] in the case derive from a common nucleus of operative fact and are such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding."  *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 77 F.3d 1063, 1067 (8th Cir. 1996) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988)) (internal quotation marks omitted).

### IV.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)), *cert. denied*, 132 S. Ct. 1144 (2012).  "[S]elf-serving allegations and denials are insufficient to create a genuine issue of material fact."  *Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010).  "To survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding

---

[1] Iowa courts have not yet held that a private cause of action may arise from a violation of the Iowa Constitution.  However, as this court recognized in *McCabe v. Macaulay*, 551 F. Supp. 2d 771, 784-85 (N.D. Iowa 2007), the Iowa Supreme Court would likely recognize such an action.

in [its] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)) (internal quotation marks omitted). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *See Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011).

## V. RELEVANT FACTUAL BACKGROUND

Construing the facts in the light most favorable to Plaintiff, the nonmoving party, and affording him all reasonable inferences, the relevant facts are as follows.

### A. Parties

Plaintiff is a citizen and resident of Atkins, Iowa, which is in Benton County, Iowa. At all material times, Deputy Upah was an employee of the Benton County Sheriff's Department. Benton County is a governmental subdivision of the State of Iowa and operates the Benton County Sheriff's Department.

### B. Facts Underlying Complaint

On September 12, 2009, Plaintiff lived in an apartment with his girlfriend, Rebecca Andersen. On that date, Ms. Andersen's son, Nicholas Andersen, who lived with his father, Steve Andersen, was visiting his mother and Plaintiff. During the visit, Nicholas heard Plaintiff arguing with his mother. Nicholas heard a slap and believed that Plaintiff had hit his mother. Nicholas called his father, Mr. Andersen, and told him that Plaintiff was fighting with Ms. Andersen. Nicholas reported that Plaintiff had slapped Ms. Andersen and that Plaintiff was throwing things across the room and swearing at her. Mr. Andersen told Nicholas to return home and then Mr. Andersen went to the apartment to check on Ms. Andersen. At 9:40 p.m., Benton County 911 Dispatch received a call from an individual in an apartment adjoining Plaintiff and Ms. Andersen's residence. The caller reported loud noise and yelling coming from Plaintiff and Ms. Andersen's residence.

4

Deputy Upah was on patrol when he received the call from Dispatch regarding the loud noise complaint, and he arrived at the apartment complex shortly thereafter. When Deputy Upah arrived at the apartment complex, Mr. Andersen explained that he had been out with a friend when his son, Nicholas, called him and reported that Plaintiff had slapped Ms. Andersen and that Plaintiff had thrown items across the room. Mr. Andersen told Deputy Upah that he had instructed Nicholas to walk home and that he drove to the apartment to check on Ms. Andersen. Later that evening, Mr. Andersen explained in a voluntary written statement that, when he arrived at the apartment, Plaintiff was "drunk" and "violent" and "threatened" both Mr. and Ms. Andersen. Voluntary Statement, Defendants' App'x (docket nos. 7-2 through 7-3) at 8.

As Deputy Upah approached Plaintiff and Ms. Andersen's front door, which was open approximately two to three inches, he could hear a male voice yelling profanities. Deputy Upah knocked on the front door, identified himself as "Sheriff's Office" and nudged the door open slightly. Defendants' Statement of Undisputed Material Fact (docket no. 7-1) at ¶ 7; Plaintiff's Response to Defendants' Statement of Undisputed Facts (docket no. 14-3) at ¶ 7. Plaintiff met Deputy Upah at the door. Deputy Upah had not had any prior contacts with Plaintiff. Plaintiff opened the door and Deputy Upah observed broken beer bottles on the floor, food that had been thrown around, furniture that had been turned over and a television set that had been knocked over and broken. At that point, Deputy Upah believed the situation involved a domestic assault, and he called Dispatch and asked for additional law enforcement to assist. When Plaintiff opened the door to the apartment, he told Deputy Upah that there was nothing wrong and that he "should get the fuck out of his apartment." Defendants' Statement of Undisputed Material Fact at ¶ 11; Plaintiff's Response to Defendants' Statement of Undisputed Facts at ¶ 11. Deputy Upah asked Plaintiff what had been going on and Plaintiff responded "that he and his girlfriend were getting ready to go 'fuck' and that [Deputy] Upah had screwed that up." Defendants'

5

Statement of Undisputed Material Fact at ¶ 11; Plaintiff's Response to Defendants' Statement of Undisputed Facts at ¶ 11.

During the initial contact with Plaintiff, Deputy Upah observed Plaintiff to be upset, agitated, verbal and drunk. Plaintiff confirmed that he was "very drunk." Defendants' Statement of Undisputed Material Fact at ¶ 12; Plaintiff's Response to Defendants' Statement of Undisputed Facts at ¶ 12. Ms. Andersen told Deputy Upah that Plaintiff had consumed at least a twelve pack of beer in a relatively short period of time. Deputy Upah maintains that he asked Ms. Andersen what had taken place that night and Plaintiff told Ms. Andersen that she had "better keep [her] fucking mouth shut and not say a word." Defendants' Statement of Undisputed Material Fact at ¶ 13. "[Plaintiff] admits that he told [Ms.] Andersen she did not have to talk to [Deputy] Upah or any other law enforcement officer." Plaintiff's Response to Defendants' Statement of Undisputed Facts at ¶ 13.

As Deputy Upah was talking to Ms. Andersen, Plaintiff repeatedly yelled at him to leave the apartment and used profanity. Deputy Upah claims that Plaintiff only became more irate when he instructed Plaintiff to sit down and stop yelling, that Plaintiff began walking around the apartment in an erratic, intoxicated manner and that when Plaintiff did not obey Deputy Upah's several commands to sit down and be quiet, Deputy Upah placed Plaintiff in handcuffs behind his back and told him to sit in a living room chair. Plaintiff admits that he was "loud and obnoxious" and "intoxicated." Plaintiff's Response to Defendants' Statement of Undisputed Facts at ¶¶ 11-12. However, Plaintiff denies that he was erratic and hostile and that he refused to obey Deputy Upah's commands. Regardless, Plaintiff allowed Deputy Upah to handcuff him, without any resistance, upon his first request to do so. While Plaintiff was handcuffed, Deputy Upah obtained the names of the individuals involved and relayed that information to Dispatch. Deputy Upah maintains that, as he waited for another officer, Plaintiff did not remain seated as instructed and Deputy Upah had to physically return Plaintiff to his seat on two or three

6

occasions, making Plaintiff even more irate and causing Plaintiff to use additional profanity. Plaintiff denies that he refused to stay seated. After approximately fifteen minutes, Iowa State Trooper Brad Bartz arrived. Trooper Bartz remained inside with Plaintiff while Deputy Upah took Ms. Andersen outside to speak with her. Trooper Bartz avers that, during this time, Hood "continued his yelling, swearing, screaming, ranting, and belittling comments," and "[o]n one occasion . . . he stood up from the chair and started to walk at [Trooper Bartz] aggressively." Affidavit of Bradley Bartz, Defendants' App'x at 2. Again, Plaintiff denies that he was physically uncooperative. Ms. Andersen declined to discuss the dispute with Deputy Upah and denied that Plaintiff had physically assaulted her.

At that time, Benton County Deputy Sheriff John Lindaman arrived on the scene and approached Deputy Upah, who was standing outside the apartment. They agreed that Deputy Lindaman would attempt to get a statement from Nicholas Andersen. Deputy Lindaman approached Mr. Andersen, and Mr. Andersen relayed to Deputy Lindaman that his son, Nicholas, had contacted him about the dispute. Mr. Andersen agreed to get Nicholas and bring him to the scene to speak with Deputy Lindaman. Deputy Lindaman avers that Nicholas "confirmed seeing [Plaintiff] slap his mother in the face." Affidavit of John C. Lindaman, Defendants' App'x at 6. Nicholas maintains that he never reported seeing Plaintiff slap Ms. Andersen, but only that he heard a slap and believed Plaintiff slapped her.

Deputies Upah and Lindaman conferred and agreed that probable cause existed to arrest Plaintiff for Domestic Abuse Assault, and Deputy Upah stated that he was also going to file a charge against Plaintiff for Interference with Official Acts. Deputies Upah and Lindaman returned to the apartment and Deputy Upah informed Plaintiff that he was under arrest for Domestic Abuse Assault and Interference with Official Acts. Plaintiff responded that "he 'didn't give a fuck' because he was already a felon and didn't mind going to jail."

Defendants' Statement of Undisputed Material Fact at ¶ 22; Plaintiff's Response to Defendants' Statement of Undisputed Facts at ¶ 22. Deputy Upah got Plaintiff up and out of the chair and then proceeded to walk Plaintiff out of the apartment building to his squad car.

Deputy Upah alleges that, as he walked Plaintiff to the squad car, Plaintiff pulled away from him and hit him in the chest with his elbow. Deputy Upah maintains that he then employed a take-down maneuver by placing his right hand on Plaintiff's right shoulder and putting his right knee behind Plaintiff's left knee. Deputy Upah claims that they went down to the ground together and that he landed on his knees to the left side of Plaintiff's body. In the Complaint, Plaintiff maintains that, "[w]hile leaving the apartment building, [Plaintiff] turned toward [Deputy] Upah who was holding [Plaintiff's] right arm, and made a rude comment to [Deputy] Upah. [Deputy] Upah responded to the turn and rude comment by violently throwing [Plaintiff] face first to the ground and then jumping on top of [Plaintiff]." Complaint at ¶¶ 10-11. In Plaintiff's Statement of Additional Material Facts, Plaintiff maintains that "[Plaintiff] turned towards Deputy Upah and used profanity right before [Deputy] Upah assaulted [him]. It was at that point [that Deputy] Upah responded by throwing [Plaintiff] to the ground and jumping on top of him knee first." Plaintiff's Statement of Additional Material Facts (docket no. 14-2) at ¶ 30.

After Deputy Upah's use of force, Deputies Upah and Lindaman carried Plaintiff to the patrol car and Deputy Upah immediately took him to the Marengo Hospital emergency room, where Plaintiff was diagnosed with two fractured ribs. Deputy Upah subsequently took Plaintiff to the Iowa County Jail in Marengo, Iowa. The following evening, Plaintiff was released from jail and Ms. Andersen picked him up. Plaintiff was in "great pain and could hardly walk." *Id.* at ¶ 21. Ms. Andersen took Plaintiff directly to the emergency room at Mercy Hospital in Cedar Rapids, Iowa. Plaintiff was diagnosed with broken ribs and a collapsed lung and was rushed into surgery.

8

### C. Guilty Plea

On November 23, 2010, Plaintiff entered into a plea agreement with the government, whereby he agreed to plead guilty to the pending charge of Interference with Official Acts and an additional charge of Disorderly Conduct. *See* Waiver of Rights and Plea of Guilty, Defendants' App'x at 69. In exchange, the government agreed to dismiss the charges for Domestic Assault and Assault on a Peace Officer. *See id.*; *see also* Iowa Courts Online, https://www.iowacourts.state.ia.us (last visited July 9, 2012); *Stutzka v. McCarville*, 420 F.3d 757, 761 n.2 (8th Cir. 2005) ("Courts may take judicial notice of judicial opinions and public records . . . ."). However, the parties failed to provide the court with a transcript of Plaintiff's guilty plea or any written factual basis underlying his guilty plea.

### D. Facts Underlying Proposed Amended Complaint

In the Proposed Amended Complaint, Plaintiff alleges that, "[a]fter September 12, 2009, [Deputy] Upah began stalking and improperly surveilling [Plaintiff] in an attempt to intimidate [Plaintiff] and keep him from pursuing redress for the unconstitutional acts committed by [Defendants], including repeatedly driving around the block where [Plaintiff's] apartment was located, and following [Plaintiff] at various times." Proposed Amended Complaint at ¶ 20. Plaintiff further alleges that he had never had any contact with the Benton County Sheriff's Department prior to September 12, 2009, and that within the four-month period following September 12, 2009, he had contact with the Department on at least three different occasions, including: October 14, 2009; December 10, 2009; and January 17, 2010. Plaintiff maintains that during that four-month period he was charged with a total of ten criminal offenses. Plaintiff alleges that, on one occasion, Deputy Upah was in the parking lot of Plaintiff's apartment complex with his hand on the hood of Plaintiff's car. Plaintiff confronted Deputy Upah, who said something to the effect of, "I didn't get you tonight, but I am going to get you." *Id.* at ¶ 22.

## VI. ANALYSIS

### A. Motion for Summary Judgment

Defendants maintain that the court should grant summary judgment in their favor because: (1) Plaintiff's prior guilty plea to the offense of Interference with Official Acts bars this action under the *Heck*[2] doctrine; (2) the doctrine of issue preclusion bars Plaintiff from now claiming that he did not strike Deputy Upah in the chest; (3) Deputy Upah is entitled to qualified immunity under state and federal law; and (4) Benton County has no independent liability to Plaintiff, and, alternatively, Benton County is not liable under the *Monell*[3] doctrine.

### 1. Heck *doctrine*

In *Heck v. Humphrey*, 512 U.S. 477, 487 (1994), the Supreme Court of the United States held:

> [W]hen a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

*Id.* (emphasis omitted) (footnote omitted). Accordingly, a plaintiff may not bring a civil action for damages under § 1983 that would necessarily imply the invalidity of a prior conviction or sentence. *Anderson v. Franklin Cnty., Mo.*, 192 F.3d 1125, 1131 (8th Cir. 1999).

---

[2] *Heck v. Humphrey*, 512 U.S. 477 (1994).

[3] *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658 (1978).

Defendants maintain that Plaintiff's conviction for Interference with Official Acts bars Plaintiff's suit for excessive force because: (1) "the resisting or assaultive conduct for which [Plaintiff] was convicted arises in the very context of the force employed by the police as a response"; and (2) Plaintiff's "allegations in the Complaint contradict or imply the invalidity of the resisting conviction itself." Defendants' Memorandum in Support of Motion for Summary Judgment (docket no. 7-4) at 13, 17. The court will address each of Defendants' arguments in turn.

> ### a.      The relationship between the offense and the alleged force

Defendants maintain that Plaintiff's action for excessive force is barred under the *Heck* doctrine due to the close relationship between the acts underlying Plaintiff's conviction for Interference with Official Acts and the alleged excessive force. Specifically, Defendants argue that, because Plaintiff was convicted of "resisti[ve] or assaultive" conduct, including striking Deputy Upah in the chest, Plaintiff should not be permitted to challenge the force Deputy Upah employed in response. *Id.* at 13. Plaintiff resists, arguing that his excessive force claim does not necessarily imply the invalidity of his prior conviction for Interference with Official Acts.

Generally, the *Heck* doctrine does not bar claims for excessive force arising under 42 U.S.C. § 1983. *See Goings v. Chickasaw Cnty., Iowa*, 523 F. Supp. 2d 892, 915 (N.D. Iowa 2007) ("It is settled that an excessive force claim cannot fall within *Heck*'s purview.").

> The determination of whether a § 1983 suit alleging the use of excessive force by the police is permissible under *Heck* will typically require the consideration of such factors as whether the plaintiff was charged or convicted of resisting arrest or a similar offense and the relationship of that offense to the plaintiff's allegation, as well as the nature and extent of any resistance on the part of the plaintiff. In the vast majority of cases, *Heck* will not bar the § 1983 suit on the ground that a successful § 1983 suit and the underlying state conviction are

logically contradictory.

Brian R. Means, Federal Habeas Manual § 2:14 (2012) (citing cases).

Plaintiff pled guilty to the offense of Interference with Official Acts under Iowa Code section 719.1, which states, "A person who knowingly resists or obstructs anyone known by the person to be a peace officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer . . . commits a simple misdemeanor." *Id.* § 719.1(1). As noted above, the court does not know the facts underlying Plaintiff's guilty plea. Defendants maintain that Plaintiff's conviction for Interference with Official Acts is based, at least in part, on Plaintiff striking Deputy Upah in the chest. However, the government did not pursue the Assault on a Peace Officer charge against Plaintiff, and Defendants have provided no evidence that Plaintiff's guilty plea necessarily includes an admission that Plaintiff struck Deputy Upah in the chest. Plaintiff maintains that, while he did not strike Deputy Upah in the chest, he did engage in numerous other acts that would constitute sufficient grounds to support his Interference with Official Acts conviction. Because the court cannot find, on this record, that Plaintiff admitted striking Deputy Upah in the chest with his elbow, the court cannot find that the force Deputy Upah employed was closely related to Plaintiff's conduct.

Defendants cite several cases, none of which are binding on this court, to support their position that Plaintiff's excessive force claim is *Heck*-barred because Plaintiff's criminal misconduct is "so closely interrelated" to and "inextricably intertwined" with the excessive force claim. Defendants' Memorandum in Support of Motion for Summary Judgment at 16. However, each of the cases Defendants cite are inapposite. For example, in *Cunningham v. Gates*, 312 F.3d 1148, 1151 (9th Cir. 2002), the Ninth Circuit Court of Appeals considered whether *Heck* barred a plaintiff's excessive force claims. The plaintiff in *Cunningham* was one of two robbers who exchanged gunfire with police after police surrounded the getaway car. *Id.* The plaintiff was charged and convicted of

attempted murder, felony murder for the death of his co-conspirator, robbery and burglary. *Id.* at 1152. The plaintiff later filed an action for excessive force against the police. *Id.* The Ninth Circuit considered the plaintiff's two theories for his excessive force claims and found that such claims were *Heck*-barred under both theories. *Id.* at 1154-55.

Defendants rely on the Ninth Circuit's holding that the plaintiff's excessive force claims were *Heck*-barred because "there was no break between [the plaintiff's] provocative act of firing on the police and the police response that he claims was excessive." *Id.* at 1155. However, Defendants misconstrue the nature of the Ninth Circuit's holding. The Ninth Circuit did not base its holding merely on the relationship or proximity of the criminal act to the excessive force claim. Instead, the basis of the holding in *Cunningham* was that, in order for the plaintiff to prevail on his excessive force claim, he "would need to call into question other elements necessary for his state convictions." *Id.* at 1154. "Indeed, in convicting [the plaintiff] of felony murder, the jury concluded that the police response was a natural consequence of [the plaintiff's] provocative act." *Id.* at 1155. In contrast, in the instant action, Plaintiff's guilty plea to the offense of Interference with Official Acts does not amount to a concession that any force used during or subsequent to his resistance or obstruction was reasonable. Furthermore, a finding that Deputy Upah responded to Plaintiff's resistance or obstruction with excessive force would not call into question any element of Plaintiff's conviction for Interference with Official Acts under Iowa Code section 719.1(1).

The remainder of the cases Defendants cite, either in the Memorandum in Support of the Motion for Summary Judgment or at the Hearing, are likewise distinguishable. For example, in *Walter v. Horseshoe Entertainment*, No. 11-30867, 2012 WL 2041536, at *2 (5th Cir. June 6, 2012), the Fifth Circuit Court of Appeals found that the appellants' excessive force claims were *Heck*-barred because "[t]heir convictions for resisting arrest and their claim of use of excessive force stem from a single interaction." However, in the

13

instant action, Plaintiff was not convicted of resisting arrest, and the record does not establish that Plaintiff pled guilty to the act of pulling away from Deputy Upah or striking him in the chest.

Even if Plaintiff's conviction for Interference with Official Acts was based, in part, on Plaintiff pulling away from Deputy Upah and striking him in the chest, Plaintiff's excessive force claim would not necessarily imply the invalidity of his underlying conviction. *See Schreiber v. Moe*, 596 F.3d 323, 334-35 (6th Cir. 2010) (finding that "[t]he mere fact that [a conviction for resisting arrest] and the § 1983 claim [for excessive force] arise from the same set of facts is irrelevant" because, unless the criminal offense makes the lack of excessive force an element of the crime or excessive force is an affirmative defense to the crime, an excessive force claim is unlikely to conflict with an underlying criminal conviction); *Lora-Pena v. FBI*, 529 F.3d 503, 506 (3d Cir. 2008) (per curiam) (finding that the plaintiff's prior convictions for resisting arrest and assaulting federal officers did not bar his excessive force claim because the question of whether the officers used excessive force was not put before the jury and the plaintiff's "convictions for resisting arrest and assaulting officers would not be inconsistent with a holding that the officers, during a lawful arrest, used excessive (or unlawful) force in response to his own unlawful actions").  Consequently, Plaintiff's § 1983 claim is not *Heck*-barred on this basis.

### b.    *Whether Plaintiff's Complaint contradicts the facts underlying his conviction*

Defendants next argue that, even if a claim for excessive force is not necessarily inconsistent with Plaintiff's underlying conviction for Interference with Official Acts, Plaintiff's excessive force claim is nonetheless *Heck*-barred because Plaintiff's Complaint directly attacks the facts underlying Plaintiff's conviction.  Plaintiff resists, claiming that he did not plead guilty to striking Deputy Upah, and "[t]he Simple Misdemeanor

14

[C]omplaint sets out a detailed factual basis for the crime without the need for the last sentence referencing that [Plaintiff] allegedly 'hit' [Deputy] Upah in the chest." Plaintiff's Brief in Support of Resistance to Defendants' Motion for Summary Judgment (docket no. 14-1) at 7.

As discussed above, Plaintiff pled guilty to the offense of Interference with Official Acts under Iowa Code section 719.1(1). The parties did not provide the court with the factual basis underlying Plaintiff's guilty plea. As a result, the court does not know what acts served as the basis for Plaintiff's conviction. As Plaintiff argues, the Simple Misdemeanor Complaint charged him with several acts, each of which could support a conviction for Interference with Official Acts. Specifically, the Simple Misdemeanor Complaint states:

> On Saturday[,] September 12, 2009[,] . . . I was dispatched to [an apartment] in Atkins for a report of a possible domestic disturbance. I arrived on scene and was met by [Plaintiff] and his live in girlfriend. The apartment was in complete dissaray [sic], broken beer bottles, food thrown about and furniture knocked over. [Plaintiff] was very intoxicated and using profanity. I told [Plaintiff] to sit down numerous times and he told me numerous times to "fuck off" [and] get out of his apartment. I then cuffed [Plaintiff] for his safety and mine. I had to wait for back up before I could investigate the situation as [Plaintiff] would not listen to my commands. I had [Plaintiff] sit down on a chair to get him to relax. I had to place [Plaintiff] down in the chair three times as he would not listen to my verbal commands. As I walked [Plaintiff] to my squad car [he] pulled away from me and hit me in the chest with his elbow.

Simple Misdemeanor Complaint, Defendants' App'x at 15.

Plaintiff's Complaint alleges, among other things, the following facts:

> On September 12, 2009, [Plaintiff] was arrested for interference with official acts. [Plaintiff] did not resist arrest, was handcuffed behind his back, and was being taken to

[Deputy] Upah's patrol vehicle[.]   While leaving the apartment building, [Plaintiff] turned toward [Deputy] Upah who was holding [Plaintiff's] right arm, and made a rude comment to [Deputy] Upah.   [Deputy] Upah responded to the turn and rude comment by violently throwing [Plaintiff] face first to the ground and then jumping on top of [Plaintiff].   [Deputy] Upah had no legitimate reason to violently attack [Plaintiff] who was handcuffed with his arms and hands behind his back at the time.   [Plaintiff] was severely injured as the result of the violent attack upon his person by [Deputy] Upah.

Complaint at ¶¶ 8-13 (format not replicated).

Pursuant to Iowa Code section 719.1, "A person who knowingly resists or obstructs anyone known by the person to be a peace officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer . . . commits a simple misdemeanor." *Id*. § 719.1(1).   Plaintiff's guilty plea to Interference with Official Acts could have been based on any of the acts of resistance or obstruction charged in the Simple Misdemeanor Complaint, including: ordering Deputy Upah to leave his apartment during an investigation; disobeying Deputy Upah's commands; or repeatedly standing up from the chair Depty Upah placed him in.   In fact, Plaintiff was placed under arrest for Interference with Official Acts before he allegedly hit Deputy Upah.   Accordingly, the facts Plaintiff alleges in the Complaint to support his excessive force claim do not necessarily contradict his conviction for Interference with Official Acts.

The court recognizes that several courts have held that, under circumstances where a "civil rights complaint [for excessive force] makes specific allegations inconsistent with the facts upon which the criminal conviction was based, *Heck* will bar the § 1983 suit." Means, *supra*, § 2:14 (citing cases); *see, e.g.*, *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 657 (5th Cir. 2007) (finding the plaintiff's excessive force claims were *Heck*-barred because his "suit squarely challenges the factual determination that underlies his conviction for resisting an officer" (quoting *Arnold v. Town of Slaughter*, 100 F. App'x 321, 324-25

16

(5th Cir. 2004))); *Cunningham*, 312 F.3d at 1154 (finding the plaintiff's claims were "barred under *Heck* because the complaint disputed several factual issues that the state jury had already resolved against him"). However, in the instant action, where the factual basis of Plaintiff's criminal conviction is unclear, the court cannot find that the allegations in the Complaint are necessarily inconsistent with the facts upon which Plaintiff's criminal conviction is based. *Cf. McCann v. Neilsen*, 466 F.3d 619, 621-23 (7th Cir. 2006) (holding that the plaintiff's allegations were not necessarily inconsistent with the underlying conviction). Accordingly, the court declines to find that Plaintiff's excessive force claim is *Heck*-barred.

## 2.     *Issue preclusion*

Defendants also maintain that the doctrine of issue preclusion bars Plaintiff from asserting his version of the facts as stated in the Complaint. Specifically, Defendants argue that, when Plaintiff pled guilty to Interference with Official Acts, he admitted that he pulled away from Deputy Upah and struck him in the chest, as the Simple Misdemeanor Complaint alleges. Thus, Defendants maintain, Plaintiff cannot now assert facts contrary to those established by his guilty plea. Plaintiff resists, arguing that he never admitted to striking Deputy Upah in the chest and that such fact should not be given preclusive effect because it is not a material element of the offense of Interference with Official Acts. Plaintiff further argues that issue preclusion does not apply because "a factual basis for the guilty plea existed without reliance on any allegation of assault." Plaintiff's Brief in Support of Resistance to Defendants' Motion for Summary Judgment at 8.

"Issue preclusion, or collateral estoppel, provides that once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Advanced Commc'ns Corp. v. MCI Commc'ns Corp.*, 263 F.3d 793, 795 (8th Cir. 2001) (quoting *Plough v. W. Des Moines Cmty. Sch. Dist.*, 70 F.3d 512, 515 (8th Cir. 1995))

(internal marks omitted). A federal court "look[s] to state law in determining whether to apply issue preclusion." *Continental Holdings, Inc. v. Crown Holdings Inc.*, 672 F.3d 567, 573 (8th Cir. 2012).

> Under Iowa law, issues of fact are given preclusive effect if: (1) the issue of fact concluded is identical to that concluded in the prior action; (2) the issue of fact was raised and litigated in the prior action; (3) the issue of fact was material and relevant to the disposition of the prior action; and (4) the determination made of the issue of fact in the prior action was necessary and essential to the resulting judgment.

*Plough*, 70 F.3d at 516 (footnote omitted). "The rule is well established in Iowa that a validly entered and accepted guilty plea precludes a criminal defendant from relitigating essential elements of the criminal offense in a later civil case arising out of the same transaction or incident." *Dettmann v. Kruckenberg*, 613 N.W.2d 238, 244 (Iowa 2000) (en banc).

Plaintiff pled guilty to the offense of Interference with Official Acts. The elements of this offense include: (1) knowledge of the officer's status as a peace officer; (2) knowledge that the officer was acting within the scope of his lawful duty or authority; and (3) knowing resistance or obstruction of the officer. *See State v. Buchanan*, 549 N.W.2d 291, 293 (Iowa 1996). Significantly, while the use of actual or constructive force would be sufficient to support a charge of Interference with Official Acts, the use of such force is not required to establish a violation. *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1107 (8th Cir. 2004).

Plaintiff's conviction for Interference with Official Acts only precludes relitigation of issues necessary to establish a violation of such offense. Specifically, Plaintiff is precluded from relitigating the determination that Plaintiff knowingly resisted or obstructed Deputy Upah, who was a peace officer acting within the scope of his lawful authority. Plaintiff's conviction does not preclude future litigation of issues not "necessary and

essential" to his conviction. *Plough*, 70 F.3d at 516. As Plaintiff makes clear, he committed various acts that would be sufficient to support his conviction for Interference with Official Acts, without requiring a finding that he hit Deputy Upah in the chest. Thus, Plaintiff is not precluded from litigating the issue of whether Plaintiff pulled away from Deputy Upah and struck him in the chest because such a finding was not necessary for his conviction. Accordingly, the court shall deny the Motion for Summary Judgment insofar as it seeks dismissal on the basis of issue preclusion.

### 3. *Qualified immunity*

As an alternative ground for summary judgment, Defendants maintain that Deputy Upah is entitled to qualified immunity because Deputy Upah's force was used in response to Plaintiff's assault against Deputy Upah. Plaintiff resists, arguing that Deputy Upah is not entitled to qualified immunity because he violated Plaintiff's clearly established constitutional right to be free from excessive force.

"A government official sued in his individual capacity may raise the defense of qualified immunity." *Sisney v. Reisch*, 674 F.3d 839, 844 (8th Cir. 2012). "Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Stepnes v. Ritschel*, 663 F.3d 952, 960 (8th Cir. 2011)) (internal quotation marks omitted). Such officials are "entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the plaintiffs, establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation, such that a reasonable officer would have known that his actions were unlawful." *Bernini v. City of St. Paul*, 665 F.3d 997, 1002 (8th Cir. 2012) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)), *petition for cert. filed*, No. 11-1490 (U.S. June 6, 2012). The court may address either question first. *See Pearson*, 555 U.S. at 236. "'If either question is answered in the negative, the public

official is entitled to qualified immunity.'" *Norris v. Engles*, 494 F.3d 634, 637 (8th Cir. 2007) (quoting *Vaughn v. Ruoff*, 253 F.3d 1124, 1128 (8th Cir. 2001)).

In evaluating a Fourth Amendment claim for excessive force, "[the court] consider[s] whether [an officer's] actions were objectively reasonable and balance[s] 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Bernini*, 665 F.3d at 1006 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "[I]n reviewing whether the use of force was reasonable, [the court] consider[s] 'the totality of the circumstances, including the severity of the crime, the danger the suspect poses to the officer or others, and whether the suspect is actively resisting arrest or attempting to flee.'" *Montoya v. City of Flandreau*, 669 F.3d 867, 871 (8th Cir. 2012) (quoting *Cook v. City of Bella Villa*, 582 F.3d 840, 849 (8th Cir. 2009)). "Whether a particular use of force is unreasonable 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Bernini*, 665 F.3d at 1006 (quoting *Graham*, 490 U.S. at 396).

"To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, ___ U.S.___, ___, 132 S. Ct. 2088, 2093 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. ___, ___, 131 S. Ct. 2074, 2078 (2011)) (internal quotation marks omitted). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft*, 131 S. Ct. at 2083). "This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably . . . anticipate when their conduct may give rise to liability for damages." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)) (internal quotation marks omitted).

> The degree of injury suffered, to the extent "it tends to show the amount and type of force used," is also relevant to [the

> court's] excessive force inquiry. *Chambers v. Pennycook*, 641
> F.3d 898, 906 (8th Cir. 2011). And while "[n]ot every push
> or shove, even if it may later seem unnecessary in the peace of
> a judge's chambers violates the Fourth Amendment," *Cook*,
> 582 F.3d at 849, [the Eighth Circuit Court of Appeals has]
> repeatedly acknowledged "force is least justified against
> nonviolent misdemeanants who do not flee or actively resist
> arrest and pose little or no threat to the security of the officers
> or the public," *Brown v. City of Golden Valley*, 574 F.3d 491,
> 499 (8th Cir. 2009).

*Montoya*, 669 F.3d at 871 (internal citations altered).

Defendants maintain that Deputy Upah's actions do not constitute a clearly established violation of constitutional law because Deputy Upah merely took Plaintiff down to the ground after Plaintiff pulled away from Deputy Upah and struck him in the chest. However, there is a genuine issue of material fact in this case as to whether the acts occurred as Deputy Upah claims or, rather, as Plaintiff claims. The parties' differing versions of the events constitute genuine issues of material fact precluding summary judgment.

At the summary judgment stage, the court must construe the facts in the light most favorable to Plaintiff and afford him all reasonable inferences. *See id.* Construing the facts in the light most favorable to Plaintiff, the facts demonstrate that, while Deputy Upah was taking Plaintiff to his patrol vehicle, Plaintiff turned toward him and made a rude comment. Deputy Upah then threw Plaintiff face first to the ground and jumped on top of him, causing Plaintiff severe injuries, including fractured ribs and a punctured lung. Plaintiff has provided the court with evidence to support his claims, including an affidavit from Ms. Anderson corroborating his version of the events and a letter from a medical doctor stating, with a reasonable degree of medical certainty, that Plaintiff was subjected to excessive force. This evidence, construed in the light most favorable to Plaintiff, establishes the violation of a clearly established right to be free from excessive force.

Accordingly, Deputy Upah is not entitled to qualified immunity on Plaintiff's excessive force claim arising under federal law. *See Bernini*, 665 F.3d at 1002 (noting that an officer is not entitled to qualified immunity if the evidence, viewed in the light most favorable to the plaintiff, establishes a violation of a clearly established constitutional right.

As noted above, the Iowa Supreme Court would likely adopt a private right of action for violations of the Iowa Constitution. Plaintiff concedes that, "for purposes of ruling on this summary judgment motion, and unless and until the Iowa Supreme Court rules otherwise, the qualified immunity analysis to be applied regarding Iowa based constitutional claims would be the same as [f]ederal based claims." Plaintiff's Brief in Support of Resistance to Defendants' Motion for Summary Judgment at 13. Applying the same analysis to Plaintiff's excessive force claim arising under Iowa law, Deputy Upah is likewise not entitled to qualified immunity on Plaintiff's state law claim.

### 4.   *Municipal liability*

Plaintiff's Complaint names Benton County as a defendant and alleges:

> Benton County is liable for the wrongful and unconstitutional conduct of [Deputy] Upah because such conduct was in accord with the policy, pattern, or practice of . . . Benton County; and/or due to a lack of proper training and supervision by the Benton County Sheriff's Department; and/or because of the actual or constructive knowledge of similar prior unconstitutional acts by [Deputy] Upah.

Complaint at ¶ 18. Benton County maintains that the court should grant it summary judgment because Benton County cannot be liable if there is no underlying constitutional violation and because the one incident at issue in this case is insufficient to demonstrate a municipal policy or custom. Plaintiff concedes that Benton County would be entitled to summary judgment if the court granted summary judgment in favor Deputy Upah. However, Plaintiff maintains that summary judgment as to Deputy Upah is inappropriate, and, therefore, Benton County's motion for summary judgment is premature.

"To establish municipal liability under § 1983, a plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009). "There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." *Id.* at 817-18 (citing *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008)). The Eighth Circuit has "observed an important distinction between claims based on official policies and claims based on customs." *Jenkins v. Cnty. of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009). "To establish the existence of a policy, [the plaintiff] must point to 'a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters.'" *Id.* (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir.1999)). "In contrast . . . , [the Eighth Circuit has] emphasized that a custom can be shown only by adducing evidence of a 'continuing, widespread, persistent pattern of unconstitutional misconduct.'" *Id.* (quoting *Mettler*, 165 F.3d at 1204).

The Supreme Court has explained that, for a municipality to be liable for failure to train under § 1983:

> a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 410 (1997). Thus, when city policymakers are on actual or constructive notice that a particular omission in their

23

training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.* at 407. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities . . . ." *Id.* at 392; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials . . .").

*Connick v. Thompson*, ___ U.S. ___, ___, 131 S. Ct. 1350, 1359-60 (2011) (internal citations altered) (format not replicated).

Defendants' first argument, that Benton County cannot be liable because there is no underlying constitutional violation, is not viable in light of the court's conclusion that Plaintiff has sufficiently alleged an underlying constitutional violation to survive summary judgment.

Defendants next argue that Benton County cannot be liable because the single incident of excessive force alleged in the instant action is insufficient to demonstrate a municipal pattern, practice, policy or custom. *See Mettler*, 165 F.3d at 1205 ("A single incident normally does not suffice to prove the existence of a municipal custom."). Defendants maintain that "[t]his case represents the only claim that has ever been made against Deputy Upah for excessive force." Defendants' Memorandum in Support of Motion for Summary Judgment at 37 (emphasis omitted). In his affidavit, Deputy Upah avers that "[t]his case is the first time, ever, that I have been sued professional[ly] as a Deputy Sheriff, and it is also the first time anyone has ever claimed that I used excessive force. In fact, the only other complaint by a citizen about me is that I was

speeding." Affidavit of Dave Upah, Defendant's App'x at 99.

Plaintiff resists arguing:

> The evidence submitted by [Defendants] to show that [Plaintiff's] [C]omplaint is the "only claim" ever made against [Deputy] Upah fails to establish a basis for summary judgment in light of Rebecca Andersen's affidavit. Rebecca Andersen states that she and [Plaintiff] were not allowed to file a complaint in this case. Thus, the fact, even if true, that [Deputy] Upah has never had an excessive force claim "file[d]" against him is meaningless, since no such complaints are allowed to be filed in Benton County. In this case, like *Parrish v. Luckie*, 963 F.2d 201, 204-05 (8th Cir. 1992), [Plaintiff] has submitted evidence that [Defendants] "avoided, ignored, and covered up complaints" of excessive force.

Plaintiff's Brief in Support of Resistance to Defendants' Motion for Summary Judgment at 13-14 (internal citations omitted).

The only evidence Plaintiff submitted in resistance to the Motion for Summary Judgment on the claim against Benton County consists of one paragraph in Ms. Andersen's affidavit, which states:

> [Plaintiff] and I tried to file a complaint with the Benton County Sheriff about the way [Plaintiff] was treated. We set up an appointment with Sheriff Forsyth and when we got to his office he refused to talk us [sic] about what happened. The Chief Deputy was also present. Sheriff Forsyth played a message for us from the Benton County Attorney stating in essence that no one at the Sheriff's office should talk to us. Sheriff Forsyth did not allow us to make any complaint whatsoever either verbally or in writing.

Affidavit of Rebecca Andersen, Plaintiff's App'x (docket no. 14-4) at 9. However, as Defendants point out, it would have been improper for the Benton County Sheriff, Randall L. Forsyth, to speak to Plaintiff about any facts underlying Plaintiff's criminal charges without his attorney present. Defendants maintain, and Plaintiff does not dispute, that the Benton County Attorney spoke with Plaintiff's counsel in the criminal action. During that

conversation, Plaintiff's counsel requested that Plaintiff not be interviewed outside the presence of counsel. The Benton County Attorney then communicated to Sheriff Forsyth that he should not interview Plaintiff without his counsel present. Sheriff Forsyth avers that, when Plaintiff arrived to meet with him without counsel present, Sheriff Forsyth advised Plaintiff that he could not speak to him or take any statement from him without his attorney present so long as the criminal charges were pending. *See* Affidavit of Randall L. Forsyth, Defendants' Supp. App'x (docket no. 17-3) at 2.

The case Plaintiff cites to support his position, *Parrish*, 963 F.2d at 204-05, is distinguishable from the instant action. In that case, the Eighth Circuit found that there was overwhelming evidence to support a jury finding that the city was liable because city officials knew of prior incidents of police misconduct and deliberately failed to take remedial action. *Id.* at 204. In contrast, in the instant action, the only evidence Plaintiff has presented to support his claims against Benton County include a single incident of alleged excessive force and the Benton County Sheriff's refusal to speak to Plaintiff about the incident without Plaintiff's counsel present. Because Plaintiff has failed to provide the court with any materials to support his position on this issue, he has failed to point to any genuine issue of material fact that would preclude summary judgment on this issue.

Plaintiff's counsel avers that, "[i]n order to respond to the allegation that no claim has ever previously been filed against [Deputy] Upah, [Plaintiff] will need to conduct discovery, including the service of interrogatories and requests to produce, along with taking the depositions of [Deputy] Upah and others who may be familiar with [Deputy] Upah's reputation for the use of excessive force." Affidavit of David A. O'Brien, Plaintiff's App'x at 3. Specifically, Plaintiff's counsel maintains that "should the court determine that the allegation made by [Deputy] Upah that no complaint of excessive force has ever been filed against him to be dispositive, then [Plaintiff] would request time to conduct discovery on that issue." *Id.* at 4. Specifically, Plaintiff's counsel states:

> Plaintiff . . . will need time to conduct discovery regarding the policy in place in Benton County regarding the use of force in effectuating arrests; whether [Deputy] Upah followed that policy; and the training [Deputy] Upah received in implementing that policy, in particular with regard to the take-down maneuver allegedly used by [Deputy] Upah; prior to being able to respond to the summary judgment motion based upon "a single claim" of wrongful conduct on the part of [Deputy] Upah.

*Id.*

The court rejects Plaintiff's request for discovery at this late date. On September 1, 2011, Plaintiff filed the Complaint. On September 22, 2011, Defendants filed the Answer. Plaintiff did not make any attempts to seek discovery at that time. Subsequently, on November 30, 2011, Defendants filed the Motion for Summary Judgment. At that time, Plaintiff was well aware of Defendants' intent to seek dismissal of Plaintiff's claims against Benton County on the basis that Plaintiff failed to establish a pattern, practice, policy or custom. Had Plaintiff's counsel filed a proper motion and affidavit explaining that he needed time to conduct additional discovery to respond to the Motion for Summary Judgment, the court would have granted such a motion. *See* Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or to take discovery . . . .").

In fact, the court did grant Plaintiff's "Motion for Extension of Time to File Response to Defendants' Motion for Summary Judgment" ("Motion to Extend Time") (docket no. 10), which Plaintiff filed on December 6, 2011. *See* Order (docket no. 11) (granting Plaintiff an additional thirty days to resist the Motion for Summary Judgment). However, Plaintiff still failed to seek any discovery "regarding the policy in place in Benton County regarding the use of force in effectuating arrests; whether [Deputy] Upah followed that policy; and the training [Deputy] Upah received in implementing that

policy." Affidavit of David A. O'Brien, Plaintiff's App'x at 4. On December 15, 2011, the court entered a Scheduling Order and Discovery Plan (docket no. 12) establishing deadlines for the parties to complete discovery. Although Plaintiff did not file his Resistance to the Motion for Summary Judgment until forty-three days later, Plaintiff did not seek any discovery on Benton County's excessive force policy or training program during that time.

Plaintiff maintains that, "should the court determine that the allegation made by [Deputy] Upah that no complaint of excessive force has ever been filed against him to be dispositive, then [Plaintiff] would request time to conduct discovery on that issue." Affidavit of David A. O'Brien, Plaintiff's App'x at 4. This is not a proper motion for additional discovery under Federal Rule of Civil Procedure 56(d). Furthermore, it would be improper to allow Plaintiff to proceed in this manner. Plaintiff failed to request any discovery until all summary judgment briefing was completed, and he only asks the court for permission to conduct discovery "should the court determine," *id.*, that the issue is dispositive. The court finds that Plaintiff had ample opportunity to conduct discovery in this action. *See Ballard v. Heineman*, 548 F.3d 1132, 1136 (8th Cir. 2008) ("[A] district court does not abuse its discretion by denying further discovery 'where the nonmoving party is not deprived of a fair chance to respond to the summary judgment motion.'" (quoting *Nord v. Kelly*, 520 F.3d 848, 852 (8th Cir. 2008))). Additionally, Plaintiff's request for discovery is so general that it appears to constitute nothing more than a fishing expedition. *See Duffy v. Wolle*, 123 F.3d 1026, 1041 (8th Cir. 1997), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1059 (8th Cir. 2011) ("'Rule 56[(d)] does not condone a fishing expedition' where a plaintiff merely hopes to uncover some possible evidence of a constitutional violation." (quoting *Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997))). Although the court finds that Plaintiff's failure to present any genuine issue of material fact regarding Benton County's municipal policy, pattern or

practice is determinative, the court declines to grant Plaintiff any additional time to conduct discovery. *See Ballard*, 548 F. 3d at 136 ("Discovery does not need to be complete before a district court grants summary judgment."). Accordingly, the court shall grant the Motion for Summary Judgment insofar as it seeks dismissal of the claims against Benton County.

### B. Motion to Amend

Plaintiff seeks to amend the Complaint by adding two additional counts. Count II of the Proposed Amended Complaint seeks to add a First Amendment claim, alleging that on September 12, 2009, Plaintiff was exercising his right to freedom of speech when he made a rude comment to Deputy Upah and Deputy Upah retaliated by using excessive force against Plaintiff. Count II also alleges that the retaliation "continued for the next four months or more in the form of [Defendants] improperly stalking, stopping, threatening and surveilling [Plaintiff] in an effort to intimidate him into not pursuing an excessive force claim against [Defendants]." Proposed Amended Complaint at ¶ 29. Count III of the Proposed Amended Complaint seeks to add a retaliation claim, alleging that Defendants "violated Plaintiff's right to freedom of speech and to be free from an unreasonable search and seizure by retaliating against him after the September 12, 2009 incident." *Id.* at ¶ 32. Defendants resist the Motion to Amend, arguing that the statute of limitations bars the additional counts.

A district court may deny a motion for leave to amend a complaint on the basis of futility if the district court finds "that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010) (quoting *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008)) (internal quotation mark omitted). Accordingly, the court will consider whether Plaintiff's Proposed Amended Complaint is barred by the applicable statute of limitations or should otherwise be dismissed for failure to state a claim

upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The applicable statute of limitations is two years. *See Williams v. Hawkeye Cmty. Coll.*, 494 F. Supp. 2d 1032, 1039-40 (N.D. Iowa 2007) (finding the appropriate statute of limitations for § 1983 claims arising in Iowa is two years when such claims arise out of the original act and not a subsequent amendment thereto); *Waterman v. Nashua-Plainfield Cmty. Sch. Dist.*, 446 F. Supp. 2d 1018, 1026 (N.D. Iowa 2006) (same).

As previously noted, Plaintiff's Proposed Amended Complaint purports to state a claim for a First Amendment violation and for retaliation. The First Amendment claim is based on the September 12, 2009 incident, as well as three subsequent interactions Plaintiff had with the Benton County Sheriff's Department on October 14, 2009, December 10, 2009, and January 17, 2010. The retaliation claim is based only on the three subsequent interactions. The original Complaint is based only on the September 12, 2009 incident, and none of the facts alleged in the Proposed Amended Complaint regarding Plaintiff's three subsequent interactions with the Benton County Sheriff's Department are included in the original Complaint.

The court finds that the allegations in the Proposed Amended Complaint arising out of Plaintiff's interactions with the Benton County Sheriff's Department subsequent to September 12, 2009, are time-barred because more than two years passed between the date of injury and the date Plaintiff filed the Motion to Amend and because the additional claims do not relate back to the original Complaint. *See* Fed. R. Civ. P. 15(c) ("An amendment to a pleading relates back to the date of the original pleading when," among other things, "the amendment asserts a claim or defense that arose out of the conduct, transaction or occurrence set out . . . in the original pleading . . . ."). However, Count II of the Proposed Amended Complaint does relate back to the extent that it is based on the September 12, 2009 incident. *See id.* Accordingly, the court shall grant the Motion to Amend insofar as it seeks to add Count II alleging that Deputy Hood retaliated against

Plaintiff for exercising his First Amendment right to freedom of speech by using excessive force when he arrested Plaintiff.  However, the court shall deny the Motion to Amend insofar as it seeks to add acts that occurred after the September 12, 2009 incident.  Thus, Plaintiff may file an amended complaint adding a second count against Deputy Upah only, alleging a First Amendment violation arising out of the events that took place on September 12, 2009.

## VII.  CONCLUSION

In light of the foregoing, it is **HEREBY ORDERED THAT**:

(1)   Defendants' "Motion for Summary Judgment" (docket no. 7) is **GRANTED IN PART** and **DENIED IN PART**;

(2)   Plaintiff's claims against Benton County are **DISMISSED**; and

(3)   Plaintiff's "Motion for Leave to File First Amended and Substituted Complaint and Jury Demand" (docket no. 18) is **GRANTED IN PART** and **DENIED IN PART**.

**DATED** this 16th day of July, 2012.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA